IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

DISTEFANO, INCORPORATED
   2906 Chestnut Hill Dr.
   Ellicott City, MD 21043

     - and -

DWAYNE DISTEFANO

   2906 Chestnut Hill Dr.
   Ellicott City, MD 21043

                       Plaintiffs

  v.                                               **Case No. 1:22-cv-01493**

TASTY BAKING COMPANY

                       Defendant

  Serve:

     CSC-Lawyers Incorporating Service
     Reg. Agent
     351 West Camden Street
     Baltimore MD 21201

## **COMPLAINT**

Now come Plaintiffs DISTEFANO, INCORPORATED ("DI") and DWAYNE DISTEFANO ("Mr. DiStefano") (collectively "Plaintiffs"), and for their Complaint herein state and allege as follows:

1.    At times relevant to this lawsuit, Plaintiffs delivered food products to retail stores and other end users on behalf of Defendant Tasty Baking Company ("Defendant" or "TBC") pursuant to a certain written distributorship agreement between TBC and DI. DI's principal, Mr. DiStefano, effectively acted as a delivery driver for TBC.

2. As explained in greater detail below, TBC breached that contract by, *inter alia*, (i) depriving DI of earned income and other compensation, and (ii) unilaterally terminating the distributorship without cause. In effect, TBC stole routes and revenue from DI.

3. TBC also violated the Maryland Fair Distributorship Act, Md. Code [Comm. Law.] § 11-1301, *et seq.* ("MFDA") by refusing to work with DI in good faith to adopt a plan to cure DI's alleged performance deficiencies before purporting to terminate the parties' agreement for cause.

4. In addition, TBC at all relevant times misclassified Mr. DiStefano as an independent contractor and failed to pay him overtime wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et. seq.*; the Maryland Wage and Hour Law ("MWHL"), Md. Code [Labor and Employment] § 3-401 *et seq.*; and the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code [Labor and Employment] § 3-501 *et seq.*

## PARTIES

5. DI is a corporation formed under the laws of the State of Maryland and having its principal place of business in the State of Maryland.

6. Mr. DiStefano is a resident of the State of Maryland. He is, and, at all times relevant to this Complaint, was DI's sole shareholder.

7. Mr. DiStefano is, and at all relevant times was, an employee under Maryland law.

8. TBC is a Pennsylvania corporation with its principal place of business at 4300 South 26th Street, Philadelphia, PA 19112. It also has locations, and regularly does business, in the State of Maryland.

9. TBC is, and at all relevant times was, an employer under Maryland law.

10. TBC is engaged in commerce, has annual sales exceeding $500,000 and employs individuals engaged in the production of goods for commerce and/or handling, selling, or working on goods or materials that have been moved in or produced in commerce. As such, Defendant is an employer subject to the FLSA.

## JURISDICTION AND VENUE

11. Defendant directs systematic and continuous activities within the State of Maryland and therefore is subject to personal jurisdiction in this Court.

12. Personal jurisdiction over Defendant also exists because the claims in this case directly arise from Defendant's activities in the State of Maryland.

13. This Court has subject matter jurisdiction over the FLSA claim pursuant to 29 U.S.C. § 216(b) (establishing private cause of action under FLSA) and 28 U.S.C. § 1331 (Federal Question).

14. This Court likewise has subject matter jurisdiction over claims in this case pursuant to both 28 U.S.C. §§ 1332 (Diversity of Citizenship) and 1367 (Supplemental Jurisdiction).

15. Venue in this Court is appropriate pursuant to 28 U.S.C. § 1391(b)(2).

## FACTS

**I.     The TBC-DI Distribution Agreement**

16. Defendant TBC is in the business of manufacturing, distributing, and selling food products, including fresh-baked pies, cakes, donuts, soft cookies and/or similar fresh-baked products ("Products") throughout the United States to retail stores whose principal business is the sale of food to the general public and to mass merchandising accounts, including restaurant and institutional accounts except for multi-outlet restaurants and institutional accounts requiring bulk shipment to central locations (collectively "Outlets").

17. In distributing its Products to Outlets, Defendant has entered into "Distributor's Agreements" with individual distributors who, *inter alia*, deliver the Products to Outlets and

perform basic merchandising tasks (e.g., stocking shelves) at the Outlets. The services performed by distributors are integral to Defendant's business.

18. Through its principal, Mr. DiStefano, DI entered into a certain Tasty Baking Company Distributor's Agreement dated April 5, 2004 and attached hereto as Exhibit A (the "Agreement").

19. In 2017, DI purchased an additional route to be serviced under the Agreement.

20. Pursuant to the Agreement, DI was given the exclusive right to sell and distribute Products to Outlets in a defined geographic "Sales Territory." *See* Exhibit A, §§ 1.1, 1.7.

21. The Agreement was for an indefinite term, with TBC forbidden to terminate or cancel it so long as DI "faithfully carrie[d] out the terms [t]hereof." *See id.* § 10.1.

22. The Agreement identified certain types of non-curable distributor breaches that would permit TBC to terminate upon 24 hours' written notice. In addition, the Agreement would automatically terminate upon the death of DI's majority principal.

23. Aside from those circumstances, however, Defendant's right to terminate was contractually limited and subject to specific notice protocols:

> In the event of any other failure of performance by DISTRIBUTOR, TASTY shall give DISTRIBUTOR written notice thereof, specifying in reasonable detail the nature of DISTRIBUTOR'S failure of performance. If DISTRIBUTOR fails to cure such failure of performance within ten (10) days of receipt of such notice, TASTY may thereafter terminate this Agreement and DISTRIBUTOR shall have no further right to cure. The parties further agree that more than two (2) notices under this Section 10.4 in a period of twelve (12) consecutive months shall constitute substantial harm to TASTY'S business, and in such event TASTY shall be entitled to terminate this Agreement . . . .

*See* Exhibit A, § 10.4.

24. TBC's contractual termination right was circumscribed by the Maryland Fair Distributorship Act, Md. Code [Comm. Law.] § 11-1301 *et seq.* ("MFDA"). That statute generally

4

requires a 60-day notice to terminate for cause and gives the distributor 30 days after receipt of same to serve notice of an intent to oppose cancellation (an "Opposition Notice"). Assuming timely service of an Opposition Notice, the MFDA also requires the parties to make good faith efforts to mutually adopt a plan to cure the alleged deficiencies.

25.     The Agreement's section entitled "ACTIONS FOLLOWING TERMINATION" reads as follows:

> Upon termination under Sections 10.2, 10.3 or 10.4 above, TASTY shall use reasonable efforts, recognizing the limited personnel TASTY has for such purpose, to operate the Distribution Rights for the account of the DISTRIBUTOR, in accordance with TASTY policy, as established from time to time. DISTRIBUTOR shall reimburse TASTY for all costs and expenses incurred by TASTY in the operation of the Distribution Rights.

*See* Exhibit A, § 10.5.

26.     Further, the Agreement requires the distributor, post-termination, to sell his/her/its distribution rights to a "qualified and approved purchaser." *See id.* § 10.5.2. In the event that the terminated distributor does not do so within a reasonable amount of time, TBC would have the right to sell the distribution rights on the terminated distributor's behalf. *See id.* § 10.5.3.

**II.    The Parties' Employment Relationship**

    **A.    Defendant's Control Over Mr. DiStefano's Work**

27.     Defendant exerted substantial control over the most basic aspects of Mr. DiStefano's work.

28.     At all times relevant to this case, Defendant required Mr. DiStefano to arrive at a designated warehouse, load a vehicle with Defendant's Products, and deliver the Products to the Outlets pursuant to Defendant's direction.

29.     Defendant required Mr. DiStefano to drive vehicles weighing less than 10,000 pounds to and from Outlets, carry food products into and out of Outlets, stock and rearrange

5

Products on store shelves, and follow Defendant's various inventory control protocols and requirements.

30. Defendant required Mr. DiStefano to stock store shelves pursuant to detailed "planograms" and other directives; deliver food products to unprofitable corporate accounts; utilize inventory control and record-keeping systems developed exclusively by Defendant; and participate in marketing programs determined solely by Defendant.

31. Mr. DiStefano's work for Defendant required basic skills that he learned through Defendant's on-the-job training.

32. Defendant dictated the circumstances under which food items must be removed from Outlets as "stale."

33. Defendant also prohibited Mr. DiStefano from determining food item prices; negotiating with Outlets concerning product prices, promotional programs, or other merchandising issues; adjusting food item orders; or delivering competitors' food products.

34. Defendant solely controlled and determined whether a retail store was placed on a cash payment system or on a charge/credit payment system. Distributors had no control over this determination.

35. At all relevant times, Defendant paid each distributor pursuant to a system that required the purchase of food items from Defendant at prices unilaterally set by Defendant. The distributor then owed Defendant the monies associated with these purchases, creating a debit on the distributor's respective weekly compensation reports.

36. When the food products were sold to an ultimate consumer (usually a store customer), a distributor would receive a credit for the ultimate sale price, plus a commission

depending on the product. This ultimate sale price was negotiated between Defendant and the Outlets without any meaningful distributor input.

37. If, due to error or theft, the food product was not scanned by a customer at the store, the distributor would be responsible for a portion of the cost. This scanned-based system was maintained and controlled by Defendant, and the resulting data was provided by the retail stores directly to Defendant.

38. Defendant did not, at any time relevant to this case, provide workers' compensation and unemployment insurance to its distributors.

**B.  TBC's Knowing Failure to Pay Overtime Wages**

39. Mr. DiStefano was required at all relevant times to work approximately 71 hours per week.

40. TBC knew that Mr. DiStefano worked for more than 40 hours each week given the Outlets he served and the amount of time required in each location.

41. Defendant failed to pay Mr. DiStefano overtime compensation for any week that Mr. DiStefano worked in excess of 40 hours.

42. In failing to pay overtime premiums, Defendant acted willfully and with reckless disregard of clearly applicable FLSA, MWHL, and MWPCL provisions.

**III.  TBC's Pretextual Termination of the Agreement**

43. Upon information and belief, Defendant, in recent years, has targeted certain distributors for termination for reasons other than performance.

44. Distributors such as DI, however, were in long-term agreements that could not be terminated without cause. Thus, Defendant needed to manufacture cause in order to meet its goals.

45. To justify the improper termination of Plaintiffs, who had been in TBC's distribution system since 2004 – and whom, as of 2017, Defendant deemed worthy of an additional route – Defendant both created pretextual defaults and entirely ignored its MFDA obligations.

A. **The Overcode Scheme**

46. TBC set targeted distributors up to fail by engaging in the following tactics, referred to herein as the "Overcode Scheme": (i) requiring distributors to maintain adequate quantities of product pursuant to Agreement § 2.2; (ii) providing distributors primarily with "short-code" products (i.e., products whose shelf lives were shorter than normal, sometimes to expire between the time of delivery and the time of the *next* scheduled delivery); (iii) making it financially, practically, and contractually impossible for distributors to return all short-code products; (iv) sending representative to stores of targeted distributors *between* delivery dates to document the presence on the shelves of unsold, now "overcode" products (i.e., products with expired dates); and (v) holding those distributors in breach of the Agreement's prohibition against overcode products.

47. TBC's enforcement was highly selective, as it knowingly allowed overcode product to remain on the shelves of (i) non-targeted distributors' routes, and (ii) the routes that TBC itself was operating.

B. **TBC's Actions Toward Plaintiffs**

48. At some point in time, TBC decided to target DI for termination and therefore employed the Overcode Scheme to improperly manufacture multiple defaults.

49. TBC also furthered its improper ends by effectively slandering Plaintiffs to a certain customer's district manager. Specifically, Mr. DiStefano had contacted his TBC supervisor on one occasion in September 2021 to state that his truck had broken down and that a replacement

8

distributor was needed. The TBC representative not only failed to replace Plaintiffs that day, but also neglected to notify the customer's district manager about the breakdown. Instead, TBC falsely told the customer representative that Mr. DiStefano had been appearing at the store only once per week instead of the required four times.

50. TBC's conduct had the intended result: The district manager concluded that Mr. DiStefano had committed multiple "no shows" and therefore refused all future service from Plaintiffs. TBC then used that manufactured "cause" as an additional basis to declare DI's default under the Agreement.

51. TBC sent pretextual default notices to Plaintiffs dated July 15, July 22, and September 23, 2021.

52. Thereafter, by letter dated September 29, 2021, TBC Market Vice President Brett Bonnett (i) purported to terminate the Agreement effective October 1, 2021; and (ii) expressed TBC's plans to immediately assume operation of the distributorship and "seek to sell [DI's] distribution rights to a qualified purchaser."

53. TBC's two-day notice of intention to terminate was far shorter than the 60 days required by the MFDA and ignored the distributor's statutory right to serve a notice of its own intent to oppose cancellation.

54. Plaintiffs, through their counsel, sent Defendant a notice urging it to cease and desist from the announced termination and expressing DI's intention to oppose cancellation pursuant to the MFDA.

55. TBC refused DI's demand, pursuant to the statute, that the parties engage in a good faith effort to cure alleged defaults. Specifically, Defendant incorrectly contended that DI's situation fell within certain MFDA exceptions relating to alleged (i) abandonment of the

Agreement, (ii) breaching conduct that "materially affects the relationship between distributor and grantor[,]" and (ii) distributor conduct that "materially alters the commercial viability of the grantor's commercial goods in the marketplace[.]"

56. Thereafter, TBC, pending its sale of Plaintiffs' distribution rights to a replacement distributor, assumed management of those routes on Plaintiffs' behalf.

57. In so doing, TBC woefully mismanaged DI's business, charged DI exorbitant fees (thereby depriving DI of the revenue to which it was entitled), and – by repeatedly leaving overcode products at Outlets formerly served by Plaintiffs – unintentionally proved the pretextual nature of its purported bases for termination and its arguments regarding applicability of the MFDA's statutory exceptions.

## COUNT I
## FLSA
## (By Mr. DiStefano)

58. Plaintiffs allege and incorporate by reference the factual allegations set forth above, as if fully set forth herein.

59. TBC is engaged in commerce, has annual sales exceeding $500,000, and employs individuals engaged in the production of goods for commerce and/or handling, selling, or working on goods or materials that have been moved in or produced in commerce. As such, Defendant is an employer subject to the FLSA.

60. Plaintiffs' work was part of the regular business of Defendant, and Defendant exercised a high degree of control over that performance. Accordingly, Mr. DiStefano was an employee entitled to the FLSA's protections.

61. The FLSA requires that employees receive overtime premium compensation calculated at 150% of their regular pay rate for all hours worked over 40 per week. *See* 29 U.S.C. § 207(a)(1).

62. Mr. DiStefano worked over 40 hours per week throughout the relevant time period. Defendant violated the FLSA by failing to pay Mr. DiStefano overtime premium compensation for hours worked over 40 per week.

63. In violating the FLSA, Defendant acted willfully and with reckless disregard of clearly applicable FLSA provisions.

64. There is no bona fide dispute that Mr. DiStefano is owed wages for the work performed while employed by Defendant.

65. As such, he is entitled to all related remedies provided by the FLSA.

66. Mr. DiStefano has been harmed by those violations in an amount to be determined at trial but exceeding $75,000.00.

**COUNT II**
**MWHL**
**(By Mr. DiStefano)**

67. Plaintiffs allege and incorporate by reference the factual allegations set forth above, as if fully set forth herein.

68. Defendant employed Mr. DiStefano and is subject to the requirements of the MWHL. *See* Md. Code [Labor and Employment] §§ 3-401 *et. seq.*

69. The MWHL requires that employees receive overtime premium compensation calculated at 150% of their regular pay rate for all hours worked over 40 per week. *See id.* §§ 3-415(a), 3-420(a).

70. Mr. DiStefano worked over 40 hours per week throughout the relevant time period.

11

71. For each weekly period, Defendant willfully and intentionally withheld overtime wages owed to Mr. DiStefano under the MWHL.

72. There is no bona fide dispute that Mr. DiStefano is owed wages for the work performed while employed by Defendant.

73. Mr. DiStefano has been harmed by those violations in an amount to be determined at trial but exceeding $75,000.00.

74. Mr. DiStefano is entitled to all related remedies provided by the MWHL.

### COUNT III
### MWPCL
### (By Mr. DiStefano)

75. Plaintiffs allege and incorporate by reference the factual allegations set forth above, as if fully set forth herein.

76. Defendant employed Mr. DiStefano and is subject to the requirements of the MWPCL. *See* Md. Code [Labor and Employment] §§ 3-501 *et. seq.*

77. The MWPCL requires an employer to pay its employees all wages due for work that the employee performed at least once every two weeks or twice in each month.

78. In the event of termination of employment, the MWPCL requires payment of all pre-termination work performed by the employee on or before the day on which the employee would otherwise have been paid the wages.

79. The MWPCL generally forbids an employer to reduce the amount of wages owed to employees.

80. Defendant willfully and intentionally failed to pay Mr. DiStefano monies that were due and owing to him, including all overtime wages described in this Complaint.

81. There is no bona fide dispute that Mr. DiStefano is owed wages for the work performed while employed by Defendant.

82. Mr. DiStefano has been harmed by those violations in an amount to be determined at trial but exceeding $75,000.00.

83. Mr. DiStefano is entitled to all related remedies provided by the MWPCL.

## COUNT IV
## BREACH OF CONTRACT
## (By DI)

84. Plaintiffs allege and incorporate by reference the factual allegations set forth above, as if fully set forth herein.

85. Defendant breached the covenant of good faith and fair dealing implied in the Distributor Agreements by purposely hindering Plaintiffs' ability to perform.

86. Defendant further breached the contracts by terminating them despite Plaintiffs' faithful performance of their duties thereunder.

87. Defendant breached the Agreement's implied covenant of good faith and fair dealing by, *inter alia*, willfully impeding DI's ability to perform under the Agreement, creating a pretext for termination, willfully violating the requirements of the Maryland Fair Distributorship Act, Md. Code [Comm. Law.] § 11-1301, *et seq.*, and depriving DI of post-termination compensation to which it was entitled.

88. DI has been harmed by those statutory violations in an amount to be determined at trial but exceeding $75,000.00.

## COUNT V
## MFDA
## (By DI)

89.  Plaintiffs allege and incorporate by reference the factual allegations set forth above, as if fully set forth herein.

90.  Defendant violated the MFDA by, *inter alia*, (i) failing to give DI the requisite notice of termination; and (ii) refusing, after receipt of DI's timely notice of intention to oppose cancelation, to work with DI in good faith to adopt a plan to cure DI's alleged performance deficiencies before purporting to terminate the Agreement for cause.

91.  DI has been harmed by those breaches in an amount to be determined at trial but exceeding $75,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court award the following relief:

A.  Payment of all overtime wages;

B.  Reimbursement of all improper pay deductions, fees, charges, and other out-of-pocket expenditures;

C.  The value of Defendant's unpaid worker's compensation and unemployment insurance payments;

D.  Liquidated damages under the FLSA;

E.  Treble damages under the MWPCL;

F.  An award of reasonable attorneys' fees and costs under the FLSA and MWPCL;

G.  Compensatory and incidental damages for breach of contract in an amount to be determined at trial, but not less than $75,000;

H. Compensatory and incidental damages for violation of the MFDA in an amount to be determined at trial, but not less than $75,000;

I. Prejudgment interest;

J. All agreed-upon and/or required benefits and compensation to which either Plaintiff is or was entitled;

K. All available declaratory or injunctive relief; and

L. Such other relief as the Court deems just and proper.

## JURY DEMAND

Trial by jury is demanded as to all issues eligible for such trial.

Respectfully submitted,

____/s/_____
David G. Ross
Federal Bar No. 16287
ROSS LAW FIRM, LLC
1 Research Ct.
Suite 450
Rockville MD 20850
Telephone: (301) 610-7730
Facsimile: (301) 519-8001
dgr@davidrosslaw.com

*Counsel for Plaintiffs*

Dated: June 17, 2022